BOSTON SAFE DEPOSIT AND TRUST COMPANY AND C. OLIVER WELLINGTON, EXECUTORS OF THE WILL OF CLINTON H. SCOVELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 49272.    Promulgated May 15, 1934.

*Charles M. Rogerson, Esq.*, for the petitioner.
*Ralph F. Staubly, Esq.*, for the respondent:

OPINION.

MATTHEWS: The Commissioner determined that there was a deficiency of $12,287.33 in estate taxes due from the estate of Clinton H. Scovell. The issues involved are: (1) The amount to be included in the gross estate as the value of decedent's interest in a partnership where under the partnership agreement $100,000 of such interest was to be paid and was paid with the proceeds of a life insurance policy carried by the partnership on the life of decedent, payable to beneficiaries designated by insured, all the premiums on the policy having been paid by the partnership; (2) whether amounts pledged by decedent prior to his death to two alleged charitable purposes and paid after his death, are deductible; and (3) whether any amount is deductible by reason of the gift of the remainder estate to charity after life estates to certain persons in being and others not yet born.

The facts were stipulated by the parties, a copy of the articles of partnership and a copy of the will of decedent being a part of the stipulation.

(1) Clinton H. Scovell died December 31, 1926 and at that time he was a general partner in the firm of Scovell, Wellington and Company.

(2) In accordance with the terms of the Articles of Partnership of the Firm of Scovell, Wellington and Company insurance was carried on the life of said Clinton H. Scovell in the face or principal amount of $100,000. Premiums on said insurance were paid by said partnership.

(3) After the death of said Clinton H. Scovell said insurance was paid in the amount of $90,000 to his estate and $10,000 to named beneficiaries.

(4) The value of the interest of said Clinton H. Scovell in the partnership assets of Scovell, Wellington and Company, capital and profits, at the time of the decedent's death, was $129,247.19, against which it was provided by the partnership agreement that there should be debited, as and for the purpose stated in the partnership agreement, the amount of the life insurance upon the decedent's life, the premiums of which were paid by the firm. The insurance upon the lives of the members of the partnership, paid for by the firm, in accordance with the partnership agreement, was, substantially, in proportion to their respective interests in the firm.

(5) Said Clinton H. Scovell during his lifetime pledged the sum of $1,500 to the Newton Hospital Building and Equipment Fund, $1,000 of which remained unpaid at the time of his death, but which has since been paid by his executors. Said pledge was made in consideration of the pledges of others to make similar donations.

(6) Said Clinton H. Scovell during his lifetime by the terms of a circular letter offered to pay the sum of $1,500 as prizes for essays to be written and presented by members of the National Association of Cost Accountants. At the time of his death, essays had been submitted in response to this offer which were subsequently judged and the prizes in the total amount of $1,500 were paid in accordance with the terms of said offer.

(7) By the terms of the will of said Clinton H. Scovell the residue of his estate was left in trust for the payment of annuities and other sums, and upon the completion of said payments, the then existing principal and accumulated income was to be paid to charitable and municipal corporations which fall within the purview of paragraph (3) of subdivision (a) of Section 303 of the Revenue Act of 1926, all in accordance with the will * * *.

(8) The value of the net estate as determined by the Commissioner, including the $90,596.63 of insurance as such (of the face value of $90,000, referred to in paragraph (3) above), and treating the decedent's interest in the partnership of Scovell, Wellington and Company as possessing a value, as of the date of the decedent's death, of $129,479.19, and without any deduction for bequest to charity, is $447,102.89.

(9) The ages of the annuitants and the persons to whom payments are to be made as of the date of death of Clinton H. Scovell are:

1. Rosa W. Scovell_____ 52 years of age
2. Albert D. Scovell_____ 86 "     "     "
3. Helen Louise Stevens_____ 33 "     "     "
4. Margaret C. Gustin_____ 21 "     "     "
5. Carrie Mason Scovell_____ 85 "     "     "
6. Harriet Mason_____ 82 "     "     "
7. Constance E. Thatcher_____ 66 "     "     "
8. Louise M. Harleston _____ 74 "     "     "
9. Mary Wright Johnston _____ 78 "     "     "

and the following grandchildren of Constance E. Thatcher whose ages at the death of Clinton E. Scovell were as follows:

10. Eugene V. Thatcher Jr_____ 10 years of age
11. Jerome D. Thatcher_____ 8 "     "     "
12. Norma D. Thatcher_____ 4 "     "     "
13. Lois K. Stiles_____ 4 "     "     "

(10) The only two annuitants above named whose children are entitled to payments of either income or principal are Helen Louise Stevens and Margaret C. Gustin. Helen Louise Stevens had been married and at the death of Clinton H. Scovell had been divorced and had one child, Prescott A. Stevens, who was four (4) years old. Margaret C. Gustin was unmarried and was twenty-one (21) years old.

The partnership agreement is very long and elaborate. Only such provisions as are pertinent will be summarized or quoted. The purpose and business of the partnership was the general practice of public accounting, industrial engineering, business management, and such other activities as might be incidental thereto. The amount of capital invested by the general partners was to be " $200,000 more or

less ", in the proportion of two thirds by Scovell and one third by Wellington. The exact amounts were to be determined from time to time on the basis that Scovell and Wellington would jointly, in the proportion of two thirds and one third, provide such capital as might be necessary in addition to the amounts contributed by the special partners properly to finance the business of the firm. The partners were to draw salaries and interest on the balances in their capital accounts, and were to share in the profits, after profit-sharer's profits were deducted, in the proportion of two thirds and one third. Paragraph (9) provides that the profits of the business are to be the sum remaining from the gross earnings after deducting all expenses of the business. The expenses are specifically set forth and included therein as one of the items is " Premiums on life insurance policies as provided in paragraph (12) and any other insurance policies that may be agreed upon directly or indirectly benefiting the business or reserves to create an insurance fund within the business."

Paragraph (12) provides:

(12). Insurance of a continuously renewable kind shall be carried on the lives of the general partners with the policies in each case payable to the assured, or to whomsoever he may designate, always with the assured reserving the right to change and successively change the beneficiary, and with phraseology to define the insurable interest of other partners, so far as the rules and practice of the insurance companies require. All policies of insurance shall remain in the custody of the firm, and the premiums on such policies are to be paid by the firm and charged as an expense of the firm, and the administration of insurance, premiums, proceeds, and cash surrender value. shall be generally as provided in paragraphs (13) to (25), . ɑd otherwise as may be elsewhere specially provided.

The amount of insurance carried on the life of each general partner was to be at least five sevenths of his capital, with provision for its increase whenever the capital should become more than seven fifths of the principal of the insurance.

Paragraph (15) provides:

(15). In the event of the death of any general partner the proceeds of the insurance policies on the deceased partner's life (payable to the beneficiaries named in the policies), when paid, shall be entered on the partnership books as a debit to the deceased partner, as part of the settlement with him for his interest in the capital and profits of the partnership, and as a credit to the surviving general and special partners in proportion to their interests in the business as defined in paragraph (18), all on condition that each such surviving general partner shall not, after the death of the deceased partner, withdraw or require payment of any of his capital account as created by contribution as of September 1, 1925, and that each such surviving special partner shall not, after the death of the deceased partner, withdraw or require payment of any amount to his credit with the firm * * * until all of the obligations to the deceased partner have been discharged; * * *.

Paragraph (18) provides for the method. of determining the proportionate interest of the general and special partners entitled to

share in the credit for the proceeds of the insurance on the life of a deceased partner.

The provision with respect to loans on the policies provides:

(23). When the policies have been in force a sufficient time to have a loan value, money may be borrowed on them by the assured, but only for the benefit of Scovell, Wellington & Company, and only with the assent of all general partners. Such money borrowed for the benefit of the firm shall be a liability of the firm, and on the death of any general partner or at the dissolution of the partnership by mutual agreement or in the event of any of the contingencies mentioned in paragraph (22) these loans shall be paid from the assets of the firm, or proper accounting made to give the same effect as if they were paid in cash, before the division of the assets of the firm is made.

In the event of the death of a general partner the business was to be carried on by the surviving general partner or partners, with such additional general partners as the survivors might mutually agree upon, subject to certain provisions. The accounting of the business was to be continued as usual, except that the salary of a deceased partner was to cease at the end of the month in which the death occurred, and at the end of the fiscal year profits were to be determined as provided in paragraph (9) and apportioned as usual to general partners, special partners, and profit-sharers. Paragraph (30) provided that the net credit balance of the deceased partner's capital and current accounts, as determined after apportioning profits at the end of the fiscal year in which death occurred, was to be a liability of the business and of the continuing partners to pay to him as provided in paragraphs (44) and (45).

(33). The partnership shall continue to have fiscal years ending on August 31st each year, or such other date as may have been unanimously agreed to prior to the death * * * of any one general partner. The surviving general partners shall continue the business together until the end of the fiscal year which is two full years or more beyond the date of the death * * * if the death occurs * * * within the first 16 weeks of a fiscal year, otherwise to the end of the fiscal year which is three full years or more beyond the date. In any event the surviving general partners shall continue the business until they have completed the payment to the deceased * * * partner provided in paragraph (42).

Any loans on the policy of the partner who was dead were to be paid out of the firm assets.

(36). Upon the execution of an agreement by the partners who are to continue the business after the death * * * of a general partner, to carry out all the provisions of this agreement with reference to settlement with the estate of such deceased partner * * *, and with reference to a continuance of the business, title of the former general partner or partners in the partnership property shall cease, and title thereto shall vest in the continuing partners without any further act or conveyance; and * * * the legal representatives of a deceased partner shall execute such conveyance and assurances, if any, as may be necessary in law to fully and effectually vest title to all the partnership property in the continuing partners. All amounts then or

thereafter due under the provisions hereof to * * * the legal representatives of any partner deceased shall be ascertained and credited to them as promptly as possible, and paid to them as and when due under the provisions hereof, and shall constitute a debt of said continuing partners to * * * the legal representatives of a deceased partner. * * *

(39). To * * * the estate of the deceased partner there shall be credited at the end of the fiscal year in which death occurs * * * and for two or three full fiscal years thereafter—as provided in paragraph (33)— the same proportion of the net profits as would have been paid to the deceased * * * partner if living and active in the business. These profits are to be determined as stated in paragraph (9), subject to the additional provisions regarding salaries and shares in the profit-sharing plan for surviving general partners and new general or special partners, whether previously associated with the business or otherwise, as provided in paragraphs (34) to (38), and subject also to the payment of interest on the capital of the deceased * * * partner provided in paragraph (46). * * *

A payment in cash of the profits due to the legal representatives of a deceased general partner was to be made as soon as possible after the close of each fiscal year and to bear interest if not paid within 30 days after the close of the fiscal year.

(42). The surviving general partner or partners, and such additional general partners as these survivors may mutually agree upon, shall be responsible to the deceased * * * general partner or to his legal representatives, not only to pay for the capital of such deceased * * * general partner, with interest * * * and to pay the proportion of profits during the fiscal year in which any of the contingencies mentioned in paragraph (22) occurs, and through two or three full fiscal years thereafter, as provided in paragraph (39), but, if necessary, to continue payments further until in total they equal the balance of the current and capital accounts of the deceased * * * general partner, determined as defined in paragraph (30) at the end of the year in which the death * * * occurs, with interest on unpaid balances at the rate of 6% credited monthly, and an additional 2% at the end of each fiscal year as provided in paragraph (8), plus an amount equal to twice the average annual amount of profits accruing to the deceased * * * general partner for the previous five full fiscal years, both from general partners' profits and from profit participation shares.

(43). The general partners hereby bind themselves, their estates, or legal representatives, to leave all their capital in the business after death * * * subject to the foregoing provisions and provided furthermore:

(44). In case of death the proceeds of the policies of insurance on the life of the deceased partner (payable to the beneficiaries named in the policies), when paid, shall be entered on the partnership books as a debit to the deceased partner and a credit to the survivors as provided in paragraph (15). The net balance of the capital and current accounts of the deceased partner at the end of the fiscal year in which the death occurs, * * * after deducting the payment of the proceeds of the policies of insurance on his own life, shall be divided into five parts; at least two parts (two-fifths of the capital remaining) shall be paid in cash to the legal representatives of the deceased partner within the ensuing fiscal year; at least one part shall be paid in cash during the third six months; and within 90 days after the end of the second full fiscal year the total amount of the capital shall be paid in cash.

The total paid to the estate or legal representatives of a deceased partner for his capital was to be at least the amount standing to his credit when the books were closed, necessary adjustments made and profits distributed at the end of the fiscal year in which the death occurred, plus interest as provided. Any losses after the close of the fiscal year in which death occurred were to be losses of the surviving partner or partners.

The will of decedent is also very long and elaborate. Only the pertinent provisions will be summarized or quoted.

By section three decedent devised his house and $100,000 in trust for his wife, the net income, after paying taxes, insurance, and repairs on the house, to be paid to her for life. In addition, should the wife's circumstances require it, not over $2,500 a year was to be paid to his wife from the principal. On her death all principal and accumulated income was to become a part of the trust provided for under section six. There follow certain specific legacies and a specific amount left in trust, not pertinent here.

By section six all of the residue of the estate was comprehended within a trust. The amount of $3,000 from the principal was to be paid to each child of his wife's two daughters, Helen Louise Stevens and Margaret C. Gustin, when each child who was living at the time of decedent's death became 25 years of age and when each child born after decedent's death became 21 years of age. With respect to the same children, the will provides:

(31) It being my desire that the children of said Helen L. Stevens and Margaret C. Gustin shall be assured good, normal living conditions such as a discreet parent would provide for his own children, and educational opportunities, probably including college or professional training following high school, I direct my trustees, from the income of the trust, to pay to or apply for each child of said Helen and of said Margaret such amount not exceeding twelve hundred (1,200) dollars in any one year for each, until each such child is seventeen (17) years of age; and thereafter not exceeding fifteen hundred (1,500) dollars in any one year for each, until each such child who is living at the time of my death has reached twenty-five (25) years of age, and until each such child who is born after my death has reached twenty-one (21) years of age, as my trustees deem necessary to give each such child good, normal living conditions and educational opportunities.

(32) In determining the amounts to be spent or applied consideration shall be given to the ability of parents to provide such living conditions and educational opportunities, as it is not my intention that such aid shall be given where the parents are able to make suitable provision therefor, but rather to supply such living conditions and educational opportunities where by reason of the death of their parents, or their parents' inability to make such suitable provision therefor, said children would not have such living conditions and educational opportunities. The amounts to be expended and the need therefor, the method of payment or application, shall be within the absolute discretion of my trustees, and they may withhold payments to and application for any such child or all of them. In the exercise of their discretion they should be gov-

erned by the ability of parents to provide good living conditions and educational opportunities, by the need and capacity of each child therefor, and the ambition, energy and resourcefulness in self-help of each child. After any child is twenty years old I advise against any payments or application for such child unless he or she is doing distinctly creditable work in a college, or a school for professional training, of higher grade than high school; that is, I recommend that unless educational work equivalent to college preparatory grade has been completed at that time it should not be further encouraged by payments by my trustees, and that educational work in college or a school for professional training should be encouraged by payments by my trustees only in case the children are doing distinctly creditable work.

\*        \*        \*        \*        \*        \*        \*

Other annuities to various relations follow. Provisions were made for an annuity to his wife's daughter Margaret Gustin, and on her marriage and on certain conditions she was to have $2,500 from the principal. Other annuities on condition follow.

Decedent further directed that all income of the trust not paid or applied in accordance with the provisions of section six of his will, in each calendar year, should, during the life of his wife, be added at the end of each calendar year to the income of the trust of $100,000 created under section three and applied by his trustees as therein directed. After the death of his wife, all income not used in accordance with the terms of section six was to be added to and become a part of the principal of the trust, but if the income was inadequate to make the payments directed to be made, the trustees might draw upon the principal to make up such deficiency to the extent that income not used in previous years had been added to and became a part of the principal of the trust. If the income of the trust under section six was insufficient in any year to make the monthly or annual payments provided, the trustees were directed to pay or apply the available income as set forth in the will.

Provision was made for certain changes in the beneficiaries in case decedent's wife waived the provisions for her in the will and elected instead dower or statutory rights. On the termination of the trust the principal and all accumulations were to go, in the portions stated and for the purposes stated, to Harvard College, Radcliffe College, Boston School of Physical Education, Bradford Academy, city of Manchester, and city of Newton.

(1) With respect to decedent's interest in the partnership, petitioners state that the only point in issue is whether the $100,000 of insurance on the life of insured, carried as provided in the articles of partnership, of which $90,000 was payable to his estate, is to be credited upon decedent's interest in the firm, thus reducing the value of his interest, as petitioners claim, or is in effect to be taxed twice, as respondent claims, by including the $90,000 of insurance payable to the estate as part of the gross estate and including the full value

of decedent's interest in the partnership without allowing as a credit any part of the proceeds of the insurance.

The real question is how much is to be included in gross estate on account of the insurance and the decedent's interest in the partnership.

The decedent did not leave $100,000 of life insurance and also interest in a partnership of the value of $129,247.19. It is clear from the articles of partnership that the insurance was carried by the partnership for the benefit of the surviving partners, so that the surviving partners would be in a position to carry on the partnership with the same capital unaffected by the death of a partner. The insurance carried by the firm gave the surviving partners the means with which to pay for the greater part of the deceased partner's interest and at the same time to increase their capital in the partnership. The right of the insured partner to designate the beneficiaries to whom the insurance was to be paid was merely the naming by the insured of the persons to whom an equivalent amount of his partnership capital should be paid after his death. The firm and not the insured owned the policy. When, therefore, the policy became a claim by reason of the death of the insured, the beneficiaries named could not collect the amount until the policy was surrendered by the firm.

In the light of the partnership provisions, and even though the insured partner in all probability signed the application for the insurance, we are of the opinion that the insurance was not " taken out by the decedent upon his own life " within the meaning of section 302 (g) of the Revenue Act of 1926.

The value of the decedent's interest in the partnership against which the insurance proceeds were debited was stipulated to be $129,247.19. This amount should be included in the gross estate, but no amount should be included as insurance received by the executor under a policy taken out by the decedent upon his own life.

(2) Respondent in his brief concedes that the balance due at decedent's death on his subscription to the Newton Hospital Building and Equipment Fund, which was paid by his executors, is deductible; hence, we will not consider it further.

The other gift took the form of a promise by decedent during his lifetime, made in a circular letter, to pay $1,500 as prizes for essays to be written by members of the National Association of Cost Accountants. Essays had been submitted in response to this offer before decedent's death, and thereafter the executors distributed prizes in the sum of $1,500 to those adjudged best in the competition.

Respondent, relying upon *Porter* v. *Commissioner*, 60 Fed. (2d) 673; affirmed on other grounds, 288 U.S. 436; asserts that this was

not a claim under section 303 (a) (1), nor a charitable gift within the meaning of section 303 (a) (3). We have given careful consideration to this case and to prior decisions of this Board. In the *Porter* case, L. Hand, J., stated the reasons of the Circuit Court as follows:

The other question raised is of deductions claimed by the executors for payments made to fulfill the testator's benefactions. He had promised to Princeton University to pay the cost of a memorial window to be built for his son, killed in the war. To a hospital in Glen Cove, Long Island, he promised to pay for the building of an X-ray room, as another memorial. Each institution in reliance upon the promise performed the condition, and the executors paid. The record contains no evidence as to the character of either, but we take judicial notice that Princeton University is "organized and operated exclusively for * * * educational purposes", within section 303 (a)(3) of the Act of 1926. We can know nothing about the hospital. There are private hospitals, "part of the net earnings of which inures to the benefit of any private stockholder or individual". This may not be one, but upon the bare record we cannot assume so, and the taxpayer has the burden of proof.

Against this result the executors invoke section 303 (a)(1) which allows a deduction of "claims against the estate * * * to the extent that such claims * * * were incurred or contracted bona fide and for an adequate and full consideration in money or money's worth." That the testator's promise created a valid contract nobody denies; "promissory estoppel" is now a recognized species of consideration; (Restatement of Contracts section 90); indeed, the doctrine first gained currency in cases like those before us. But the section was certainly not intended to include all contracts supported by a consideration; so much is clear. We need not limit it to cases where the consideration passes to the testator; for example, a promise to pay for goods delivered to another might fall within it, if the testator has recourse over. But if he has not, the transaction is in substance a gift, and must stand or fall within section 303 (a)(3). So here, though the testator was bound by his promise, what in fact he did was to give to the hospital a memorial to his son; it was not a financial bargain at all, and subdivision one is concerned with such. Had he delivered to it a bond under seal in a state where the common law still persists, the claim would hardly have been incurred for "full consideration in money or money's worth"; though the purpose were to use the proceeds to add to its equipment. The statute cannot have meant to make critical the accident that the hospital, by acting upon the promise, fastened a debt upon the estate. So to construe the language is to confuse the purposes of the two subdivisions.

The reasoning in the *Porter* case is particularly applicable here. It is immaterial whether a valid contract would be raised on the decedent's offer to pay money prizes, for the plain condition of the statute that the contract shall be for "adequate and full consideration in money or money's worth" obviously remained unsatisfied. The change in the wording of this provision in the 1926 Act from the words "fair consideration" used in the 1924 Act sufficiently well indicates the legislative intent to substitute for the consideration necessary to support a contract at common law an equivalent in terms of money. We do not think that the gift for prizes meets this test.

Therefore, it is not deductible under section 303 (a) (1) as a claim. It is unnecessary to consider in the premises whether the claim is enforceable against the estate under local law.

Is it deductible as a gift to charity under subsection (a) (3)? We think not. The prizes were to go to members of the National Association of Cost Accountants. But even if the association was to receive the prizes, the petitioners, upon whom rests the burden of showing its charitable purpose, *Estate of Edward Moore*, 21 B.T.A. 279, put in no evidence to show that the National Association of Cost Accountants was educational or charitable in character. Judicial notice has its limits. We hold the $1,500 paid by the executors as prizes should not be allowed as a deduction from the gross estate.

3. We turn now to the last issue, whether the remainder interest of certain trusts left to charitable purposes is sufficiently ascertainable and certain to allow its deduction. In all the circumstances we think not.

Decedent's will named nine annuitants between the ages of 21 and 86 at the time of decedent's death, four more annuitants who were children at that time ranging in age between 4 and 10, and also the children of Helen Stevens and of Margaret Gustin, whether in being then or not. At the time of decedent's death, Helen Stevens was 33, had been married and divorced and had one child of the age of 4; Margaret Gustin was aged 21 and was unmarried. Invasion of the principal was allowed to the extent of $2,500 a year in favor of decedent's wife, should her circumstances require it; his wife's daughter, Margaret Gustin, was to have $2,500, on certain conditions, from the principal; and all the children, whether living at the time of decedent's death, or born thereafter, of his wife's two daughters, were to have $3,000 each from principal on reaching certain ages. The annuities, except that above-mentioned to the wife, were to be paid out of income only. This leaves for consideration the effect on the gifts to charity of the wife's possible annuity from principal of $2,500, the payment out of principal to her daughter, Margaret, and those to the Gustin and Stevens children.

Upon the basis of an expected age of 17 years more for Mrs. Scovell, who was 52 at the time of decedent's death, and of the probability of neither daughter of Mrs. Scovell having more than 10 children each, the petitioners build up an elaborate argument to show that there was a remainder of at least $219,676.14 which would go to Harvard College and the other tax-exempt uses. It is pointed out that a gift over to charity is not unascertainable merely because the principal may be invaded to some extent. *Ithaca Trust Co. v. United States*, 279 U.S. 151; *Hartford-Connecticut Trust Co. v. Eaton*, 36 Fed. (2d) 710; *Boston Safe Deposit & Trust Co. et al., Executors*, 21 B.T.A. 394.

It is unnecessary to examine these cases in detail. It need only be said that the cases relied on by petitioners for the most part deal only with the situation of the suitable maintenance of the decedent's widow in the style to which she had been accustomed, the authority of the trustees to invade the principal not extending beyond such maintenance. Such is the case here, but it is further complicated by the contingent gifts to living and unborn children. Even when we regard the estate's value and the provisions of the will as of the decedent's death in 1926, as we are supposed to do, and assume, therefore, that the estate left had then a high probability of being sufficient to fulfill the then more or less certain prophecy of the future, which events since 1929 may have since greatly altered, we should still be indulging in pure speculation when it comes to calculating the contingent gifts to the unborn children.

We do not think we are permitted to indulge in such a speculative calculation of probabilities as is urged on us by petitioners. Treasury Regulations 70, article 44, require that:

Where a trust is created for both a charitable and a private purpose, deduction may be taken of the value of the beneficial interest in favor of the former only in so far as such interest is presently ascertainable, and hence severable from the interest in favor of the private use. * * *

We are not dealing here with a legal presumption which is contradicted by facts presently ascertained and known at the time of decedent's death, such as was considered by the Supreme Court in *United States* v. *Provident Trust Co.*, 291 U.S. 272; but with factual possibilities unknown at the decedent's death, unknown now, and not likely to be definitely ascertained for many years to come. It is not a question here of fact against fiction, but of guesswork pure and simple.

While the probability of the charities taking is. here perhaps greater than in the situation before the Supreme Court in *Humes* v. *United States*, 276 U.S. 487, the definite ascertainment of the amount of the gifts over to charity is hardly more possible. As was pointed out in the *Humes* case, there are distinct limitations to the application of the actuarial art in tax cases. We think the applicability of it here to the probable natural increase of the two young women too uncertain in its results to justify its use. As was said in a recent District Court case, *Pennsylvania Co. for Insurances on Lives and Granting Annuities et al., Executors, Estate of T. C. Birnbaum* v. *Brown*, 6 Fed. Supp. 582, where there were gifts to beneficiaries with contingent gifts in designated sums to any daughters born of those beneficiaries, with gifts over the charity:

* * * This case happens to be one in which, in view of the large amount of the residuary estate, the small size of the contingent bequests and the age

of the parties, the percentage of error in any guess at the amount which will go to charity is likely to be small, but the fact that such cases will arise does not call for encroachment upon the plain policy of the law.

This case was affirmed *per curiam* by the Circuit Court of Appeals for the Third Circuit, 70 Fed. (2d) 269.

We hold, therefore, that the amount of the gifts over to charity are not sufficiently ascertainable to allow a deduction therefor from decedent's gross estate.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*